**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| Baluma, S.A., | Case No.: 2:20-cv-01424-JAD-EJY |
| Plaintiff | |
| v. | **Order Granting Motion for Summary Judgment and Closing Case** |
| Benjamin Sriqui, | [ECF No. 23] |
| Defendant | |

This case is just one card in the deck of breach-of-contract actions brought by Baluma, S.A. d/b/a/ Enjoy Punta del Este Resort & Casino in this district to recover unpaid casino markers it issued at its South American property.[1]  In this action, the casino contends that one of its patrons, Benjamin Sriqui, agreed to pay back the $100,000 that the casino lent him, but when the debt came due, Sriqui attempted to shift the blame onto another person who he claims was supposed to cover his outstanding balance.  The casino now moves for summary judgment on its contract claims and on Sriqui's counterclaims.  Sriqui contends that discrepancies within certain documents create genuine issues of material fact for a jury's resolution.  I grant the motion because I find that no genuine and material factual disputes exist about Sriqui's obligations under the markers and that he has not met his burden to demonstrate that he's an intended third-party beneficiary entitled to recover on his counterclaims.

---

[1] *Baluma, S.A. v. Patel*, 2:20-cv-01398-KJD-VCF; *Baluma, S.A. v. Penner*, 2:20-cv-01551-APG-BNW; *Baluma, S.A. v. Huang*, 2:20-cv-01547-GMN-VCF; *Baluma, S.A. v. Davydov*, 2:20-cv-01552-KJD-NJK; *Baluma, S.A. v. Mengle*, 2:20-cv-01568-KJD-VCF; *Baluma , S.A. v. Poff*, 2:20-cv-01642-JCM-DJA; *Baluma, S.A. v. Chow*, 2:20-cv-01752-KJD-EJY.

## Background

The Enjoy Punta del Este resort maintains a casino that allows its patrons to play on the house's dime, so long as the customers promise to repay the debt.  Sriqui was one such gambler. But unlike many vacationers, Sriqui visited the resort on junkets led by Johnny Chow.[2] According to Sriqui, the casino's relationship with himself and Chow was simple—Chow would act as a junket representative and invite players, like Sriqui, to the casino to gamble on the casino's dime.[3]  Sriqui would show up, sign the credit applications, take out markers against his credit line, and bet at Chow's direction.[4]  After he was done betting, he was free to enjoy the resort.[5]  And when he left, the loan—one way or another—was repaid.[6]

In January 2019, Sriqui filled out another credit application[7] that granted him privileges to use up to $100,000 from his line of credit at the resort.[8]  To access that line of credit, Sriqui signed credit instruments known as markers.  Throughout the year, he returned to Uruguay with Chow by his side and drew from his credit line.  And by the end of his 2019 trips, he had signed nine markers and gambled away all $100,000 of that advance.[9]  Though he "fully expected [the

---

[2] ECF No. 28-2 at ¶ 3 (Sriqui declaration).

[3] *See* ECF No. 28-1 at 21:19–25, 22:1–3 (Sriqui deposition).

[4] *See id.* at 26:3–9.

[5] *Id.* at 53:6–11.

[6] *Accord id.* at 53:12–15; ECF No. 28-2 at ¶ 5.

[7] ECF No. 23-1 (credit application).

[8] ECF No. 23-2 at ¶ 4 (Sriqui's RFAs); *see* ECF No. 23-3.

[9] *See* ECF Nos. 5; 23-2 at ¶¶ 8–18; 28-2 at ¶ 6.

casino] to be paid back for any amount taken out,"[10] Sriqui didn't pay back the money.[11] Instead, he believed that someone else at some point would cover the bill,[12] because that's simply how it had always worked.[13]

This time was different. When each marker's due date came and went without repayment from Sriqui, the casino sued him for his outstanding balance, asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. After I denied Sriqui's personal-jurisdiction motion to dismiss in early February,[14] he lodged four counterclaims against the casino: (1) setoff, (2) recoupment, (3) breach of contract, (4) breach of the implied covenant of good faith and fair dealing.[15] The casino now moves for summary judgment on all claims, largely relying on Sriqui's responses to the requests for admission that the casino served on him under Federal Rule of Civil Procedure 36. Because I find that the casino has shown that no genuine issues of material fact prevent summary judgment, I grant its motion.

---

[10] ECF No. 28-1 at 107:5–6; *see also id.* at 16:6–12 ("So, like, I certainly intended on the lines being paid, but as throughout history of the trips, we were there five, six, seven, times, I don't know, I'm not sure, the lines were always paid out and not ever by me. I was never privy to any of the profit. I could play at the tables. I was never privy to any of the loss from the tables. This was all Johnny.").

[11] ECF No. 23-2 at ¶ 21 ("Admit that I have not repaid any amount under the Casino Markers, but deny that the funds as contained in the Casino Markers were a loan to me.").

[12] *See* ECF No. 28-1 at 13:23–25 ("I fully expected the line to be paid back, however, not by me.").

[13] *See, e.g., id.* at 37:17–25, 38:26 ("But as far as before we left, like, when I'd fly out, I would—I always assumed that the lines were squared, like, completely by Johnny."); ECF No. 28-2 at ¶ 5.

[14] ECF No. 18 (order denying motion to dismiss).

[15] ECF No. 22 (Sriqui answer).

**Discussion**

**I.    Legal standard**

Summary judgment is appropriate when the pleadings and admissible evidence "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[16]  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."[17]  A fact is material if it could affect the outcome of the case.[18]

On summary judgment, the court must view all facts and draw all inferences in the light most favorable to the nonmoving party.[19]  So the parties' burdens on an issue at trial are critical. When the party moving for summary judgment would bear the burden of proof, "it must come forward with evidence [that] would entitle it to a directed verdict if the evidence went uncontroverted at trial."[20]  If it does, the burden shifts to the nonmoving party, who "must present significant probative evidence tending to support its claim or defense."[21]  But when the moving party does not bear the burden of proof on the dispositive issue at trial, it is not required to produce evidence to negate the opponent's claim—its burden is merely to point out the evidence that shows the absence of a genuine material factual issue.[22]

---

[16] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).

[17] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

[18] *Id.* at 249.

[19] *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

[20] *C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

[21] *Id.*

[22] *Celotex*, 477 U.S. at 323.

## II.     Baluma's breach-of-contract claim

The parties do not dispute that Baluma gave Sriqui money to gamble with.  So to succeed on its breach-of-contract claim, the casino need only demonstrate that a valid contract exists, Sriqui materially breached it, and the casino was damaged because of that breach.[23]  The casino contends that Sriqui's admissions and the markers he signed demonstrate that it's entitled to recovery.  Sriqui maintains that the documents that the casino relies on to evince a contract are inconsistent, and he argues that factual disputes about Chow's role preclude summary judgment.

### A.     A valid contract exists

"An enforceable contract requires 'an offer and acceptance, meeting of the minds, and consideration.'"[24]  Both credit applications and markers that permit patrons to draw against their casino credit lines with a promise to repay that amount may constitute a valid contract.[25]  And a "casino marker and a credit application agreement may be, but need not be, part of the same transaction."[26]

The casino relies on the January 2019 credit application, June 2019 draw request, and various markers to demonstrate a valid contract between itself and Sriqui.[27]  Though Sriqui does not deny that he executed some markers for a total of $100,000, he maintains that the markers

---

[23] *Richardson v. Jones*, 1 Nev. 405, 408 (1865); *see Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 899 (9th Cir. 2013) (citation omitted).

[24] *Anderson v. Sanchez*, 373 P.3d 860, 863 (Nev. 2016) (citing *May v. Anderson*, 119 P.3d 1254, 1257 (Nev. 2005)).

[25] *Cf. Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 536–37 (9th Cir. 2011) (discussing a casino's obligations under a bilateral marker contract in Nevada); *see Morales v. Aria Resort & Casino, LLC*, 995 F. Supp. 2d 1176, 1181 (D. Nev. 2014) ("Moreover, both the credit application and the markers are contracts, under which Morales had a duty to pay.").

[26] *Las Vegas Sands*, 632 F.3d at 537.

[27] ECF No. 23 at 6.

that the casino offers are an inaccurate demonstration of the amounts he would have requested to reach that $100,000 threshold.[28]  And he argues that those can't be the correct markers because the dates listed on them are in October 2019 and January 2020—not during the summer when the casino claims Sriqui signed them.[29]  Neither inconsistency demonstrates a genuine and material factual dispute over the validity of the contract.

Key to this analysis are Sriqui's Rule 36 admissions.  Federal Rule of Civil Procedure 36 permits a party to "serve on any other party a written request to admit . . . the truth of any matters within the scope of Rule 26(b)(1) relating to: the facts, the application of law to fact, or opinions about either."[30]  "A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or admitted,"[31] but a party must move to withdraw or amend his answers in order to receive such relief.[32]  Because facts admitted under Rule 36 are conclusively established, they "may be relied on as the basis for granting summary judgment."[33]

Through his Rule 36 responses, Sriqui admits that he filled out the credit application in January[34] that gave him marker-signing privileges;[35] in June, he requested to draw down his line

---

[28] ECF No. 28-1 at 74:5–24.

[29] ECF No. 28 at 5:10–14.

[30] Fed. R. Civ. P. 36(a)(1)(A).

[31] *Id.* at (b).

[32] *Conlon v. United States*, 474 F.3d 616, 621 (9th Cir. 2007) (citing *In re Carney*, 258 F.3d 415, 419 (5th Cir. 2001)).

[33] *Id.* (citing *O'Campo v. Hardisty*, 262 F.2d 621, 624 (9th Cir. 1958)).

[34] ECF No. 23-2 at ¶¶ 1–3.

[35] *Id.* at ¶ 4.

of credit;[36] and that he then signed nine markers[37] totaling $100,000[38] from the line of credit that he applied for in January.[39]  Importantly, he also admits that the nine markers offered are the "true and correct copies of the [c]asino [m]arkers [that he] signed."[40]  Despite those admissions, Sriqui now contends that he never would have asked for the amounts listed on the casino floor, relying on his deposition testimony and a new declaration.[41]  But Sriqui has not moved to withdraw his admissions, and merely submitting a declaration that contradicts his admissions is insufficient to create a genuine issue of fact in this circuit.[42]  His Rule 36 admissions thus conclusively establish that the credit application, draw request, and markers are a valid contract between him and the casino.[43]

Sriqui also relies on the Ninth Circuit's decision in *Las Vegas Sands, LLC v. Nehme* for the proposition that whether a credit application and a marker are part of the same transaction is

---

[36] *Id.* at ¶¶ 5–7.

[37] *Id.* at ¶¶ 9–17.

[38] *Id.* at ¶ 18.

[39] *See id.* at ¶ 8.

[40] *Id.*

[41] ECF Nos. 28-2 at ¶ 6; 28-1 at 107:1–10.  Although the casino submits a declaration to explain where and when Sriqui signed the markers, I need not and do not consider it because the casino offers it for the first time in reply.  *See Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) ("[W]here new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the non-movant an opportunity to respond.") (brackets and citation omitted)).

[42] *See Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 544 (9th Cir. 1975) (characterizing an affidavit that contradicted earlier deposition testimony as "sham issues [that] should not subject the defendants to the burden of trial").

[43] Even if I ignored Sriqui's admission that the markers produced were true and correct, his speculation about the dates are belied by the record—the dates on the markers are not the dates he signed them, they're the dates that the markers were due.  *See* ECF Nos. 23-5 at 2–4; 23-6 at ¶ 9 (noting the due dates for repayment).

a question of fact.[44]  But his admissions render that holding inapposite to this dispute.  The *Las Vegas Sands* court was confronted with a credit application that imposed certain obligations on the casino, and which was signed a year before the player executed a marker.[45]  In assessing common gaming practices, the Ninth Circuit noted that it's possible for a credit application and casino marker to be single or separate transactions, so triable issues existed there about whether the application and marker were one transaction.[46]  Unlike the gambler in *Las Vegas Sands* who presented evidence from which a jury could conclude that the marker and application—though months apart[47]—were part of a single transaction, Sriqui admitted that the markers produced were "signed *in connection with* [his] line of credit with the Casino."[48]  Even construing that admission in his favor, Sriqui has not pointed to anywhere in the record from which I could draw a reasonable inference that he had another line of credit with the casino at that time that he could have gambled with.  So I find that the casino has met its burden to establish this element.[49]

### B.   Sriqui breached the agreement when he failed to repay the markers.

A party breaches a contract when he materially fails "to perform 'a duty arising under or imposed by [an] agreement.'"[50]  The record unequivocally establishes that Sriqui has not repaid

---

[44] ECF No. 28 at 13–14.

[45] *Las Vegas Sands, LLC*, 632 F.3d at 530–31.

[46] *Id.* at 536.

[47] *Id.* at 537.

[48] ECF No. 23-2 at ¶ 8 (emphasis added).

[49] Though Sriqui argues that he had various expectations about who would cover his obligations under the contract, he does not argue that those obligations prevented a valid meeting of the minds between him and the casino.

[50] *State Dep't of Transp. v. Eighth Jud. Dist. Ct. in and for Cnty. of Clark*, 402 P.3d 677, 682 (Nev. 2017) (citation omitted).

the money that the casino gave him to gamble with.[51]  Sriqui contends that someone must have

paid off his credit line, and satisfied his obligation to perform, because the casino paid Chow

commissions in 2019.[52]  But even viewing the evidence he relies on in the light most favorable to

Sriqui, I find that the record is insufficient to create genuine issues of fact about his breach.

The commission structure for representatives like Chow depends on whether the credit

used by the players whom he brings to the resort is repaid or not.[53]  According to that agreement,

representatives would not be paid commission "until all credit instruments have been paid in full

by the applicable customer."[54]  Sriqui submits Chow's commission statements from 2019 that list

(1) the commission he is due, (2) the outstanding markers, and (3) the commission paid.[55]  He

maintains that, because Chow was paid some commission while Sriqui had an outstanding

balance, Sriqui could not have breached the contract.

Sriqui's argument relies on a misreading of the commission agreement.  Under that

agreement, the only commissions that the casino would withhold are those associated with "the

applicable customer" with an outstanding credit instrument to be paid.[56]  Chow's commission

statements confirm that reading—they list both the commission he was *due* and the commission

---

[51] *See* ECF Nos. 23-2 at ¶ 21 ("Admit that I have not repaid any amount under the [c]asino [m]arkers, but deny that the funds as contained in the Casino Markers were a loan to me.").

[52] *See* ECF No. 28 at 9, 15.  Sriqui does not raise this argument under his accord and satisfaction affirmative defense, which requires proof (1) of a dispute over an unpaid sum, (2) of a payment offered to settle that dispute, and (3) that the creditor understood the payment was in satisfaction of the debt.  *Pierce Lathing Co. v. ISEC, Inc.*, 956 P.2d 93, 97 (Nev. 1998) (citation omitted).

[53] ECF No. 23-7 at 6.

[54] *Id.* at 6, 14.

[55] *See, e.g.*, ECF No. 28-3 at 2.

[56] ECF No. 23-7 at 6, 14.

he was *paid*.[57]  So the fact that Chow received some commission during this time period does not mean that he received commission for the bets that Sriqui placed.  And while I must draw factual inferences in Sriqui's favor, I "need not draw inferences that are based solely on speculation."[58]  Because Sriqui has not provided a factual basis for me to infer that Chow's commissions in 2019 were based on Sriqui's actions, I find that his breach is beyond genuine dispute.

## C.   Damages

"[C]ontract damages are prospective in nature and are intended to place the nonbreaching party in as good a position as if the contract had been performed."[59]  Despite acknowledging that he "signed for and accepted $100,000" from the casino[60] and didn't pay it back, Sriqui argues that it's unclear what the casino is owed or is "suing on."[61]  He first relies on an email from a casino employee in June 2019 that he maintains lists his available credit as $90,000 with a "loss" of around $18,000.[62]  But the record does not demonstrate that the money that Sriqui attributes as a "loss" had anything to do with his credit line.[63]  And though that email indicates that Sriqui only had $90,000 available to him as of June 2019, "when [he] started playing,"[64] another spreadsheet that he offers demonstrates that his total "credit limit" was $100,000, with $10,000

---

[57] *See, e.g.*, ECF No. 28-3 at 5 (noting a $40,000 difference in commission due and commission paid).

[58] *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1136 (9th Cir. 2009); *Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 680–81 (9th Cir. 1985) (internal quotation marks and citation omitted).

[59] *Colorado Env'ts, Inc. v. Valley Grading Corp.*, 779 P.2d 80, 84 (Nev. 1989).

[60] ECF No. 23-2 at ¶ 18.

[61] ECF No. 28 at 13.

[62] ECF No. 28 at 14 (citing ECF No. 28-6).

[63] *See* ECF Nos. 28-6 (listing the $18,807 as "Theo"); 23-7 at 14 (defining "Theoretical Win" of the company).

[64] ECF No. 28-5 at 15:16–23.

pending at the beginning of his June trip.[65]  While the email may present an issue of fact, the record demonstrates that the issue is not a genuine one because the ultimate amount Sriqui borrowed and received from the casino was $100,000—despite his inability to access that full amount at the start of one trip.  Even if I disregarded the other evidence that Sriqui provides, this email obfuscates the crux of this dispute, leaving this disputed fact immaterial to the outcome of the case; the parties agree that, at some point, Sriqui's credit limit was $100,000 and that he, through the markers, borrowed that full amount.  The casino's claim does not center on how much was available to Sriqui in June, it centers on how much he ultimately drew down throughout 2019 under his January application and whether he paid that amount back.

Sriqui also offers one of the casino's spreadsheets that indicates that he had $51,000 in losses and $49,000 in unused credit.[66]  He maintains that this discrepancy shows that the casino cannot demonstrate that "Sriqui incurred $100,000.00 in losses while at the casino."[67]  But whether Sriqui was a successful gambler with the casino's money has no effect on how much he borrowed.  As the casino's representative testified at his deposition, Sriqui "asked for a credit of $100,000 in chips[,] and the casino registered that he only lost in chips $51,000."[68]  So while it's unclear what Sriqui did with the remaining chips, the value of the casino's claim is not dependent on his gambling losses, it's dependent on the total amount that he borrowed.

To establish a genuine issue of fact on this issue, Sriqui would have to show that he did not sign markers that totaled $100,000.  But as Sriqui's admissions make clear, he was permitted

_____

[65] ECF No. 28-8 at 2.

[66] ECF No. 28 at 14 (citing ECF No. 28-4).

[67] *Id.*

[68] ECF No. 28-5 at 9:2–4.

to—and did—borrow $100,000 from the casino.[69]  The various charts that he provides do not create a genuine issue of fact about how much the casino was damaged.  At best, they show that less than $100,000 was available to him at some point and that he didn't lose the full $100,000 during 2019.  Based on this record, I find that Baluma has met its obligation on summary judgment and that Sriqui has not presented evidence to create a triable issue.  So I grant the casino's motion on its breach-of-contract claim and direct the Clerk of Court to enter judgment for the casino and against Sriqui on this claim in the amount of $100,000.[70]

**III.     Baluma cannot recover on its remaining claims.**

The casino also lodges a claim for the contractual[71] breach of the implied covenant of good faith and fair dealing, and alternatively, a claim for unjust enrichment.  While the casino recognizes that it cannot recover for both unjust enrichment and breach of contract,[72] it argues that it's still entitled to recovery under a good-faith-and-fair-dealing claim if it's successful on its claim for breach of contract.  But under Nevada law, a claim for contractual breach of the implied covenant of good faith and fair dealing requires proof that the defendant breached its duty of good faith and fair dealing by acting in a manner unfaithful to the purpose of the

---

[69] ECF No. 23-2 at ¶ 5.

[70] Though the casino continually references interest that it's owed under the markers, it has not demonstrated what that interest calculation would be, so I enter judgment only on the amount that it has proven.

[71] ECF No. 29 at 14 ("Here, Plaintiff's claim for breach of the implied covenant of good faith and fair dealing sounds in contract, not in tort, and therefore does not require a special relationship.").

[72] *Id.* at 14–15; *see Leasepartners Corp. v. Robert L. Brooks Tr. Dated Nov. 12, 1975*, 942 P.2d 182, 187 (Nev. 1997) ("An action based on a theory of unjust enrichment is not available when there is an express, written contract, because no agreement can be implied when there is an express agreement.").

contract.[73]  So a contractual breach of the implied covenant requires the plaintiff to show that the breaching party complied with the express terms of the contract but deliberately and intentionally contravened the intention and spirit of the contract.[74]  Because the casino has shown that Sriqui did not comply with the contract's terms by not paying back the amount he owed, the casino cannot recover under for a contractual breach of good faith and fair dealing.  So I deny its motion for summary judgment on its remaining claims, and I dismiss them.

## IV.    Sriqui's counterclaims

Sriqui lodges counterclaims against the casino for setoff, recoupment, breach of contract, and breach of the implied covenant of good faith and fair dealing.  The casino argues that Sriqui cannot produce any evidence to support his counterclaims because he's not a party to, nor an intended third-party beneficiary of Chow's commission agreement with the casino.[75]  Sriqui does not point to any evidence in the record to support his counterclaims.  Instead he argues that the inconsistencies within the record about the casino's contract claim require a trial to determine whether setoff is appropriate.[76]  But Sriqui's job to resist summary judgment on his counterclaims is to come forward with specific facts that show a genuine issue for trial,[77] and Sriqui has not met that burden.

---

[73] *See Perry v. Jordan*, 900 P.2d 335, 338 (Nev. 1995) (citing *Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*, 808 P.2d 919, 923 (Nev. 1991)).

[74] *Hilton Hotels Corp.*, 808 P.2d at 923.

[75] I deny the casino's footnoted request to exclude the independent agreement under Rule 37(c). This request violates this district's local rules that govern discovery motions like this one, *see* L.R. 26-6, and any prejudice that the casino might incur from its late discovery is tempered by the casino's use of the agreement in support of its motion.

[76] ECF No. 28 at 16.

[77] Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248.

1    **A.    Neither setoff nor recoupment is warranted.**

2        "Setoff is a doctrine used to extinguish the mutual indebtedness of parties who each owe

3    a debt to one another."[78]   To demonstrate that setoff is appropriate, both parties must have valid

4    and enforceable debts against each other.[79]   While setoff may arise when the claims underlying

5    the debts are "entirely unrelated[,]" "each party" must be "mutually indebted to one another."[80]

6    Sriqui maintains that he traveled to Uruguay as a guest of Chow and that Chow had an

7    agreement with the casino for commission payments based on the players he brought.   He argues

8    that he has a valid and enforceable debt against the casino "in the form of uncredited expenses

9    [the casino] agreed to cover . . . includ[ing] airfare, lodging, food, and beverages."[81]   And he

10   claims that the casino had a history of waiving his debts "as part of its payments to" Chow for

11   Chow's commissions.[82]   Neither basis shows an enforceable debt against Baluma.

12       Sriqui does not offer any evidence to quantify the various costs the casino didn't cover.

13   Nor does the record demonstrate that the casino ever failed to cover that amount.[83]   He also fails

14   to show that his history of nonpayment with the casino wipes out any debt that he owes.   As

15

16

_____

17   [78] *Aviation Ventures, Inc. v. Joan Morris, Inc.*, 110 P.3d 59, 63 (Nev. 2005).

     [79] *Id.*

18   [80] *Id.*

19   [81] ECF No. 22 at 7.

20   [82] *Id.*   If the debt Sriqui claims that he's owed arises from the casino's commission agreement
     with Chow, his argument is misplaced.   Under that agreement, Chow doesn't get paid for
     Sriqui's bets until the amount Sriqui uses of his credit is paid off.   *See* ECF No. 23-7 at 6, 14.

21   Because Sriqui has not demonstrated that his debt was paid off, Chow couldn't claim any
     commission payments—even if Sriqui's right that the casino owes Chow a large sum of

22   commissions.

23   [83] As Sriqui testified at his deposition, he never thought that the casino was deducting his airfare
     or food and lodging from his credit line—they were merely comps that the resort provided "big
     enough players."   ECF No. 28-1 at 99:4–19, 101:16–25.

Sriqui makes clear, the casino has never sought repayment from him on his previous markers.[84] That means that even if the casino's prior acts of settling his debts with another person was a valid debt, it's not an *outstanding* one because the casino has never "ma[de] [a] demand on [him] for payment amounts."[85]

Unlike setoff, "recoupment is '[a] right of the defendant to have a deduction from the amount of the plaintiff's damages, for the reason that the plaintiff has not complied with the cross-obligations or independent covenants arising under the same contract.'"[86] So the counterclaim "must arise out of the same transaction."[87] Sriqui's alternatively pled recoupment counterclaim rests on the same theory: his expectation that Chow would repay his debt evinces an enforceable debt against the casino. But Sriqui has not pointed to any obligation under the contract that Baluma has not complied with and that would entitle him to a reduction in damages, so recoupment is similarly unavailable here.

At their core, Sriqui's affirmative defenses are that because the casino never attempted to enforce the contracts that he signed in the past, it shouldn't be able to enforce this one now. But as Sriqui makes clear in his deposition, he doesn't believe that the casino just forgot about the money it was owed—he just assumed Chow would pay the debt for him. So it appears that any indebtedness or indemnity that Sriqui may assert would be against Chow, who Sriqui did not sue in this litigation.[88] Even if Sriqui had demonstrated factual disputes to preclude summary

---

[84] ECF No. 28-2 at ¶ 5.

[85] *Id.*

[86] *Schettler v. RalRon Capital Corp.*, 275 P.3d 933, 941 (Nev. 2012) (citation omitted).

[87] *Id.* (citation omitted).

[88] This is true despite Sriqui acknowledging that Chow had guaranteed his debt. ECF Nos. 28-7 (guaranty agreement); 28-1 at 42:1–4 ("Q: So it's your understanding that he signed some sort of

1  judgment for the casino, his counterclaims are wholly separate from that contract dispute, and

2  those disputes would not prevent summary judgment on his counterclaims.

3  **B.     Sriqui has not shown that he's an intended third-party beneficiary.**

4  Sriqui's remaining counterclaims for breach of contract and breach of the implied

5  covenant of good faith and fair dealing stem from Chow's commission agreement with the

6  casino.  He claims that that agreement "called for any credit instruments to be paid before [the

7  casino] issued commissions to Mr. Chow."[89]  And he adds that the casino breached the

8  agreement because it didn't have his credit line "satisfied" "before [he] left the casino."[90]  But

9  the express terms of the agreement don't require the casino to clear the credit lines—they limit

10  the casino's obligation to pay any commission to Chow unless and until "all credit instruments

11  have been paid in full *by the applicable customer*."[91]

12  More importantly, Sriqui is not a party to the commission agreement—only Chow and

13  the casino are.  So to enforce the contract's terms, Sriqui must establish that he is an intended

14  third-party beneficiary.[92]  "Although a [party] can maintain an action on a simple contract to

15  which he is not a party, upon which he was not consulted, and to which he did not assent, when it

16  contains a provision for his benefit . . . he must prove that there was an intent to benefit him."[93]

17  Sriqui does not dispute that he is not mentioned in any commission agreement between Chow

18

19  ────────────────

    guaranty to pay for amounts related to this line of credit that you say is his, but that you used?
    A: Correct.").

20  [89] ECF No. 22 at 8.

21  [90] *Id.*

22  [91] ECF No. 23-7 at 6 (emphasis added).

23  [92] *See Lipshie v. Tracy Inv. Co.*, 566 P.2d 819, 824 (Nev. 1977) (citing *Olson v. Iacometti*, 533 P.2d 1360, 1364 (Nev. 1975)).

    [93] *Olson*, 533 P.2d at 1364.

and the casino.  Instead he argues that the various perks he received from gambling at the property demonstrate that the parties intended for customers like him to benefit from the agreement.  But a mere "incidental[] benefit [from] the performance of the agreement is insufficient"[94] to establish third-party-beneficiary status.  Sriqui has failed to demonstrate that he was an intended beneficiary of the commission structure.  And because a breach of the implied covenant of good faith and fair dealing requires the existence of a valid contract,[95] this deficiency also bars him from recovering under that counterclaim.  So I grant summary judgment in favor of the casino and against Sriqui on his counterclaims.

## Conclusion

With good cause appearing and no reason to delay, IT IS THEREFORE ORDERED that plaintiff Baluma, S.A.'s motion for summary judgment **[ECF No. 23] is GRANTED**.  The Clerk of Court is directed to **ENTER JUDGMENT in Baluma's favor and against Sriqui in the amount of $100,000, dismiss Baluma's claims for breach of the implied covenant of good faith and fair dealing and unjust enrichment, and CLOSE THIS CASE**.

_____
U.S. District Judge Jennifer A. Dorsey
August 25, 2021

---

[94] *Id.* at 1363.

[95] *See Perry*, 900 P.2d at 338 (citing *Hilton Hotels Corp.*, 808 P.2d at 923).